**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 12-cv-0465-WJM-MEH

JANET KIMBLE, as Parent and Legal Guardian of B.K., a minor, and
TYRONE KIMBLE, as Parent and Legal Guardian of B.K., a minor,

      Plaintiffs,

v.

DOUGLAS COUNTY SCHOOL DISTRICT RE-1,

      Defendant.

---

## ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

This matter is before the Court on a Motion for Summary Judgment ("Motion")
(ECF No. 15) by Plaintiffs Janet Kimble and Tyrone Kimble (collectively "Plaintiffs").
Plaintiffs bring a claim against Defendant Douglas County School District RE-1
("Defendant") under Section 504 of the Rehabilitation Act of 1973 ("Section 504") and
Title II of the Americans with Disabilities Act ("ADA"), alleging that Defendant failed to
provide educational accommodations for their minor daughter, B.K.  For the reasons set
forth below, the Motion is denied.

### I.  BACKGROUND

The following facts are undisputed.  (*See* ECF No. 14 at 7-12.)

Plaintiffs are the parents and guardians of B.K., a minor with a qualifying
disability under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§
1400 *et seq.*; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and Title II of the

ADA, 42 U.S.C. §§ 12131-12134.  (ECF No. 15 at 1-2.)  Defendant is the local public

school district where B.K. is enrolled and is responsible for compliance with the legal

requirements of both Section 504 and the ADA.  (*Id.* at 2.)  Prior to the events giving

rise to this lawsuit, Defendant had found B.K. eligible to receive special education and

related services under the IDEA and had developed Individualized Education Programs

("IEPs") for her, pursuant to the IDEA.  (*Id.*)  Plaintiffs initially consented to the provision

of special education and related services to B.K. under the IDEA, which included

various educational accommodations and modifications.  (*Id.* at 2-3.)

        In May 2010, Plaintiffs received a copy of the IEP proposed by Defendant for the

following school year, which differed from previous IEPs Defendant had developed for

B.K.  (*Id.* at 3.)  On May 19, 2010, in response to the IEP offer, Plaintiffs formally

revoked their consent to the continued provision of special education and related

services for B.K.  (*Id.*)  Plaintiffs confirmed their decision by certified letters sent to the

principals of both the elementary school B.K. would be leaving at the end of the school

year, and the middle school she would be entering and attending for the following year.

(*Id.* at 3-4.)  By letter dated May 21, 2010, the Director of Special Education for the

school district replied that, due to Plaintiffs' revocation of consent for special education

and related services under the IDEA, B.K. had become a general education student

who "may receive those accommodations available to non-disabled children," and that a

"Section 504 plan is a plan for a student with a disability; here, [B.K.]'s Section 504 plan

would be her IEP.  [Plaintiffs'] revocation of consent, therefore, also revokes consent for

those services that would be offered under Section 504."  (*Id.* at 4.)

On July 13, 2010, Plaintiffs submitted a written request to Defendant by e-mail for a meeting at the middle school pursuant to Section 504 to develop "a 504 plan, which may designate assistive technologies and additional curriculum augmentations." (*Id.*) On August 4, 2010, Defendant convened a "Section 504 meeting" for B.K.  (*Id.*)  At that meeting, Defendant and Plaintiffs agreed that B.K. qualified as a student with a disability under Section 504.  (*Id.* at 5.)  However, the Section 504 plan Defendant offered was to "implement the services as identified in the May 19, 2010 IEP."  (*Id.*) Plaintiffs did not accept the Section 504 plan because it contained the same special education and related services that Plaintiffs had rejected as part of the IEP under the IDEA.  (*Id.*)

During their attempt to obtain accommodations for B.K.'s 2010-2011 school year under Section 504, Plaintiffs received numerous e-mails from the Principal and Assistant Principal of the middle school, all indicating that B.K. could not receive disability-based accommodations in her mainstream classes due to Plaintiffs' revocation of consent for services under the IDEA.  (*Id.*)  The e-mails stated that, because Plaintiffs had "revoked consent for implementation of IDEA services and . . . [were] not in agreement with the Section 504 team's recommendation that those services be reinstated, B.K. is a general education student"; that an "IEP was written that would allow access to assistive technology and accommodations to support her learning," but Plaintiffs had "revoked [B.K.'s] right to receive special education services"; and that "for [B.K.], the educational needs, services, accommodations etc. set forth in her proposed IEP constitute her Section 504 plan.  [Plaintiffs'] revocation of consent,

therefore, also revoked consent for those Section 504 services and accommodations."
(*Id.*)

On February 23, 2012, Plaintiffs filed a complaint alleging violations of Section 504 and Title II of the ADA.  (ECF No. 1.)  After agreeing with Defendant that no dispute of fact existed to prevent the case from being decided upon summary judgment (ECF No. 14 at 13-14), Plaintiffs filed the instant Motion (ECF No. 15).  Defendant filed a Response Brief in Opposition to the Motion.  (ECF No. 17.)  Plaintiffs then filed a Reply. (ECF No. 18.)  Although Defendant filed no cross motion for summary judgment, its arguments and its request for fees in its Response in effect assert that it should receive summary judgment on these claims.  (*See* ECF No. 17.)

## II.  LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).  In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus.*

4

*Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## III.  ANALYSIS

Plaintiffs argue that Defendant discriminated against B.K. by refusing to provide her with educational accommodations under Section 504 and Title II of the ADA once Plaintiffs had revoked consent for special education and related services under the IDEA.  (ECF No. 15 at 12-13.)  Defendant argues in response that Plaintiffs' rejection of the aids, services, and accommodations in the IEP relieved it of its obligation to provide those services under Section 504 and the ADA.  (ECF No. 17 at 12.)  Because Plaintiffs' claims require interpretation of Defendant's obligations under three overlapping statutes, the Court will first review the interrelationship between those statutory obligations, and then will apply the statutes in the instant case.

## A.   Statutory Background

The IDEA "imposes obligations on the states to provide certain [educational] benefits [to disabled children] in exchange for federal funds."  *Ellenberg v. N.M. Military Inst.*, 478 F.3d 1262, 1274 (10th Cir. 2007); *see also* 20 U.S.C. § 1412(a).  The main purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education ["FAPE"] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A); *see Garcia v. Bd. of Educ. of Albuquerque Pub. Sch.*, 520 F.3d 1116, 1129 (10th Cir. 2008);

*Sytsema v. Acad. Sch. Dist. No. 20*, 538 F.3d 1306, 1312 (10th Cir. 2008) ("The FAPE concept is the central pillar of the IDEA statutory structure.").  The terms "special education" and "related services" have specific definitions encompassing particular services that a school must offer to provide to qualifying students.  *See* 34 C.F.R. §§ 300.34(a), .39(a).

"The primary tool in assuring that a [FAPE under the IDEA] is provided to all eligible children with disabilities is the requirement that the state create an individualized education plan ("IEP") for each disabled child."  *Miller v. Bd. of Educ. of Albuquerque Pub. Sch.*, 565 F.3d 1232, 1236 (10th Cir. 2009).  "The IEP is a written statement that sets forth the child's present performance level, goals and objectives, specific services that will enable the child to meet those goals, and evaluation criteria and procedures to determine whether the child has met the goals."  *Ass'n for Cmty. Living in Colo. v. Romer*, 992 F.2d 1040, 1043 (10th Cir. 1993); *see also* 20 U.S.C. § 1414(d)(1)(A).

Prior to implementation of an IEP for a child with a disability, a school district must "seek to obtain informed consent from the parent of such child before providing special education and related services to the child."  20 U.S.C. § 1414(a)(1)(D)(i)(II).  Without such consent, the school district may not provide special education and related services.  *Id.*  In 2008, the federal regulations implementing the IDEA were amended to allow for a parent's revocation of consent for special education and related services, in writing, even where the parent had previously consented to those services.  34 C.F.R. § 300.300(b)(4).  Where a parent revokes consent, the school district must cease

providing special education and related services, has no further obligation to develop an IEP for the child, and "[w]ill not be considered to be in violation of the requirement to make FAPE available to the child because of the failure to provide the child with further special education and related services." *Id.* Nevertheless, the statutory language makes clear that nothing in the IDEA is intended to interfere with or limit the "rights, procedures, and remedies available under the Constitution, the [ADA], [Section 504] of the Rehabilitation Act of 1973, or other federal laws protecting the rights of children with disabilities." 20 U.S.C. § 1415(l).

Section 504 protects individuals with disabilities from discrimination in a variety of programs and activities receiving federal financial assistance, including public elementary and secondary education programs. 29 U.S.C. § 794(a). The federal regulations implementing Section 504 require that students with disabilities be given equal access to public schools, and that they receive a FAPE by way of "the provision of regular or special education and related aids and services." 34 C.F.R. § 104.33(b)(1). Although the statutory language is framed as a negative prohibition on discrimination, the regulations clarify that a school district has an affirmative duty to identify, locate, and evaluate all children with disabilities in order to ensure that they receive a FAPE. 34 C.F.R. §§ 104.32, .35.

While the substantive content of Section 504 as applied to a child's education is similar to that of the IDEA, Section 504 has a wider scope. The definition of "individual with a disability" under Section 504 of the Rehabilitation Act is broader than the definition of a "child with [a] disabilit[y]" under the IDEA, and thus the group of students eligible for IDEA protection is a subset of the group eligible for protection under Section

7

504. *Compare* 29 U.S.C. § 706(8)(B), *with* 20 U.S.C. § 1401(a)(1)(A) (limiting protection under the IDEA to children who have one of the specific disabilities listed in the statute and who need "special education and related services" as a result of that disability).

The regulations implementing Section 504 follow the language of the IDEA, requiring that school districts "provide a [FAPE] to each qualified handicapped person who is in the [district]'s jurisdiction." 34 C.F.R. § 104.33(a). However, although both statutes require the state to provide students with a FAPE, "FAPE under the IDEA and FAPE as defined in the Section 504 regulations are similar but not identical." *Mark H. v. Lemahieu*, 513 F.3d 922, 933 (9th Cir. 2008). "[U]nlike FAPE under the IDEA, FAPE under [Section] 504 is defined to require a comparison between the manner in which the needs of disabled and non-disabled children are met, and focuses on the 'design' of a child's educational program." *Id.* at 933 (citing 34 C.F.R. § 104.33(b)(1) (a FAPE under Section 504 requires "the provision of regular or special education and related aids and services that . . . are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met")).

Further, the procedures schools are required to follow in designing a plan to provide a FAPE under Section 504 are far more vague than the IDEA's precisely outlined IEP process, and therefore are more flexible. *See* 34 C.F.R. § 104.35 (to comply with Section 504, a public entity "shall establish standards and procedures for the evaluation and placement of" qualified individuals with disabilities, including

8

"draw[ing] upon information from a variety of sources," and "ensur[ing] that the placement decision is made by a group of persons"); *Yankton Sch. Dist. v. Schramm*, 93 F.3d 1369, 1376 (8th Cir. 1996) ("Both [Section] 504 and IDEA have been interpreted as requiring states to provide a [FAPE] to qualified handicapped persons, but only IDEA requires development of an IEP."); *Weber v. Cranston Pub. Sch. Comm.*, 245 F. Supp. 2d 401, 406 (D.R.I. 2003) ("[Section 504] is a bludgeon to the IDEA's stiletto, protecting a broader swath of the population without describing a precise manner of compliance.").

The Department of Education's regulations provide that implementing an IEP that provides a FAPE under the IDEA is sufficient, but not necessary, to satisfy the FAPE requirements of Section 504. *Mark H.*, 513 F.3d at 933 (citing 34 C.F.R. § 104.33(b)(2) ("Implementation of an [IEP] developed in accordance with the [IDEA] is one means of meeting" the substantive portion of the Section 504 FAPE requirement)); 34 C.F.R. § 104.36 ("Compliance with the procedural safeguards of section 615 of the [IDEA] is one means of meeting" the Section 504 procedural requirements).  However, the converse is not true; satisfying Section 504's FAPE requirement will not necessarily satisfy the IDEA.  *See Smith v. Robinson*, 468 U.S. 992, 1019-20 (1984).

Consequently, "the requirements of the IDEA cannot be met through compliance with Section 504 because the IDEA requires an individualized program while Section 504 is a broad anti-discrimination statute."  *N.L. ex rel. Mrs. C. v. Knox Cnty. Sch.*, 315 F.3d 688, 696 n.6 (6th Cir. 2003) (citing *Muller v. Comm. on Special Educ.*, 145 F.3d 95, 100 n.2 (2d Cir. 1998)).  Similarly, a school district that denies a student a FAPE

under the IDEA does not necessarily violate Section 504, as a FAPE under Section 504 is a less stringent standard than that under the IDEA.  *See Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Sch.*, 565 F.3d 1232, 1246 (10th Cir. 2009); *Mark H.*, 513 F.3d at 933 ("Plaintiffs who allege a violation of the FAPE requirement contained in [the Section] 504 regulations . . . may not obtain damages simply by proving that the IDEA FAPE requirements were not met.").

Like the Rehabilitation Act, the ADA is a broad anti-discrimination statute that applies to individuals with disabilities beyond the realm of public education.  *See* 42 U.S.C. § 12101, *et seq.*  Title II of the ADA prohibits discrimination by "exclu[sion] from participation in or [denial of] the benefits of the services, programs, or activities of a public entity."  *See* 42 U.S.C. § 12132; 28 C.F.R. § 35.130.  When evaluating a discrimination claim under both Section 504 and Title II of the ADA, "[b]ecause these provisions involve the same substantive standards, [courts] analyze them together." *Miller ex rel. S.M.*, 565 F.3d at 1245 (citing *Urban ex rel. Urban v. Jefferson Cnty. Sch. Dist. R-1*, 89 F.3d 720, 728 (10th Cir. 1996) ("we analyze [plaintiff's] ADA claim by reference to [S]ection 504's standards").

**B.    Application**

"A prima facie case under [Section] 504 consists of proof that (1) plaintiff is handicapped under the Act; (2) he is 'otherwise qualified' to participate in the program; (3) the program receives federal financial assistance; and (4) the program discriminates against plaintiff."  *Hollonbeck v. U.S. Olympic Comm.*, 513 F.3d 1191, 1194 (10th Cir. 2008); *see Pushkin v. Regents of Univ. of Colo.*, 658 F.2d 1372, 1384 (10th Cir. 1981)

(holding that "[t]he standards for determining the merits of a case under [Section] 504 are contained in the statute," and rejecting a requirement of bad faith, proof of discriminatory intent, the *McDonnell Douglas* test, and equal protection analysis in evaluating a discrimination claim under Section 504).  Analysis of a claim under Title II of the ADA is identical to an analysis under the Rehabilitation Act.  *Nielsen v. Moroni Feed Co.*, 162 F.3d 604, 608 n.7 (10th Cir. 1998); *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1102 (10th Cir. 1999) ("Because the language of disability used in the ADA mirrors that in the Rehabilitation Act, we look to cases construing the Rehabilitation Act for guidance when faced with an ADA challenge.") (citing *Bragdon v. Abbott*, 524 U.S. 624 (1998)).  Therefore, the Court applies the Section 504 analysis for both claims. *See Hollonbeck*, 513 F.3d at 1194.

The parties have agreed that (1) B.K. has a qualifying disability under Section 504, (2) she is otherwise qualified to be a public school student in the district, and (3) Defendant receives federal financial assistance.  (*See* ECF No. 15 at 13-14; ECF No. 17 at 7.)  Therefore, the only question before the Court is whether (4) Defendant has discriminated against B.K. in failing to provide her with educational modifications in violation of Section 504 and the ADA.  *Id.*  Plaintiff argues that a plain language reading of Section 504, the IDEA, and their implementing regulations require a holding that B.K. remains eligible for educational accommodations under Section 504 and the ADA, and therefore that Defendant has discriminated against B.K. in failing to provide those accommodations.  (ECF No. 15 at 15-16.)

Defendant counters that its offer of an IEP under the IDEA sufficed to meet its

obligations under Section 504 and the ADA, and by rejecting the IEP, Plaintiffs rejected the plan that satisfied Section 504, leaving Defendant with no liability under that statute for failure to provide a FAPE to B.K.  (*See* ECF No. 17 at 8-9.)  The Section 504 regulations make clear that implementing an IEP that satisfies the IDEA FAPE requirement is sufficient to satisfy Section 504.  34 C.F.R. §§ 104.33(b)(2), 104.36. However, nothing in the statutory language or the regulations for either IDEA or Section 504 clarifies the effect of parental revocation of consent for IDEA services on Section 504 obligations.  In fact, the Department of Education comments on the 2008 amendments to the IDEA regulations explicitly avoid stating a position on the question. *See* Assistance to States for the Education of Children With Disabilities and Preschool Grants for Children With Disabilities, 73 Fed. Reg. 73013 (Dec. 1, 2008) ("These final regulations implement provisions of the IDEA only.  They do not attempt to address any overlap between the protections and requirements of the IDEA, and those of Section 504 and the ADA.").

As no binding authority exists to which the Court may defer, the persuasive value of the authority the parties cite may be considered.  Defendant relies on a 1996 guidance letter by the U.S. Department of Education's Office of Civil Rights ("OCR"), and an unreported decision from the District Court of the Western District of Missouri citing that letter.  (ECF No. 17 at 8-9 (citing *Letter to McKethan*, 25 IDELR 295 (Dec. 31, 1996) (ECF No. 15 Ex. D);  *Lamkin v. Lone Jack C-6 Sch. Dist.*, No. 11-CV-1072-DW-W (W.D. Mo. Mar. 1, 2012) (ECF No. 15 Ex. H).)  In *Letter to McKethan*, the OCR explained that a parent rejecting services under the IDEA "could not compel the district

12

to develop an IEP under Section 504 as that effectively happened when the school followed the IDEA requirements." *Letter to McKethan*. The *Lamkin* court found "*Letter to McKethan* persuasive, and [found] that the Plaintiffs' revocation of services under IDEA was tantamount to revocation under [Section] 504 and the ADA." *Lamkin*, No. 11-CV-1072-DW-W at 8.

The Court finds the *Lamkin* decision unhelpful, as its primary focus was on the plaintiffs' failure to exhaust administrative remedies, and its reliance on *Letter to McKethan* was an alternative basis for its holding and did not consider the larger statutory and regulatory context. *See Lamkin*, No. 11-CV-1072-DW-W at 6-8. Further, *Letter to McKethan* has no direct applicability to this case, as Plaintiffs do not seek to "compel the district to develop an IEP under Section 504," but rather request a Section 504 plan.[1]  (ECF No. 15 at 18-19.)

Despite Defendant's arguments to the contrary, the Court is not persuaded that a parent's rejection of an IEP, developed under the IDEA, automatically rejects any plan that could be developed under the less-restrictive Section 504 requirements. The IDEA's specified process for developing an IEP, which requires a stricter definition of a FAPE, is only "one way" of meeting Section 504's broader FAPE requirement. *See* 34 C.F.R. §§ 104.33(b)(2), 104.36. The language of the regulations suggests that permitting a school district to meet its Section 504 obligations through implementing an

---

[1] Even without resort to *Letter to McKethan*, the IDEA's implementing regulations are clear that a school district has no obligation to develop an IEP once parental consent is revoked. *See* 34 C.F.R. § 300.300(b)(4)(iv). However, as clarified in III.A., above, only the IDEA requires an IEP; compliance with Section 504 entails a less stringent procedure. *See* 34 C.F.R. § 104.35.

IEP is merely an expediency to avoid a duplicative process that would have the same result, rather than establishing a legal equivalency.  *Cf. id.*

Both the statutory language of the IDEA and the comments on its implementing regulations make clear that it may not "be construed to restrict or limit the rights, procedures, and remedies available" under Section 504 and the ADA.  *See* 20 U.S.C. § 1415(l).  Thus, the Court holds that parental revocation of consent for special education and related services under the IDEA does not eliminate the broader protection of Section 504 and the ADA.  For a student with a qualifying disability under Section 504 and the ADA, the student's right to be free from discrimination under those statutes exists without regard to her eligibility, or her parents' consent for, services under the IDEA.  *See* 29 U.S.C. § 706(8)(B); 20 U.S.C. § 1401(a)(1)(A).  Accordingly, even after Plaintiffs revoked their consent for IDEA services, B.K. remained protected from discrimination on the basis of her disability under Section 504 and the ADA.  Insofar as Defendant relies on Plaintiffs' waiver of their rights under one statute (IDEA) to insulate itself from liability under another (Section 504 or the ADA), Defendant misapprehends the law.

However, in this case, Defendant held a Section 504 meeting subsequent to Plaintiffs' revocation of consent under the IDEA.  (ECF No. 15 at 4.)  At that meeting, a Section 504 plan was proposed, whose substance was equivalent to that in the previously proposed IEP, and Plaintiffs refused to accept that plan.  (*Id.*)  Because the statutory language of Section 504 permits a school district to meet its obligations under that statute by implementing an IEP, the Court cannot find that Defendant's attempt to

implement the IEP it developed violated its obligations to provide B.K. with a FAPE under Section 504 and the ADA.[2]  Because Defendant convened a Section 504 meeting and its committee proposed a 504 plan, once Plaintiffs refused to accept it, Plaintiffs cannot hold Defendant liable for failing to provide accommodations that they rejected as part of the 504 plan.

Nevertheless, just as Defendant was required to convene a Section 504 meeting and develop a 504 plan after Plaintiffs' revoked consent for IDEA services, Defendant retains a continuing obligation under Section 504 and the ADA to protect B.K. from discrimination while she remains a qualifying student with a disability, and therefore must continue to offer any accommodations or services required to ensure that B.K. is provided an opportunity for a FAPE under Section 504.  34 C.F.R. § 104.33(b)(1). While Plaintiffs' revocation of consent for the "special education and related services" that B.K. was entitled to under the IDEA prevents Defendant from providing those services as defined in the IDEA, *see* 34 C.F.R. § 300.300(b)(4)(i), the broader scope of Section 504 permits Defendant to offer any other educational modifications or accommodations not encompassed by the IDEA's definitions of those services in order to meet its obligation to provide a FAPE.  *See* 34 C.F.R. § 104.33(b)(1).  Similarly, neither Section 504 nor the ADA permit a parent to request particular accommodations without regard to whether those accommodations constitute a FAPE; rather, the

---

[2] Plaintiffs suggest in their Reply that Defendant used Plaintiffs' revocation of consent for services under the IDEA to relieve itself of all obligation to accommodate B.K.'s disability, implying that Defendant perfunctorily proposed the same rejected IEP in the form of a Section 504 plan in order to avoid any necessity to provide services to B.K. under any statute.  (*See* ECF No. 18 at 8.)  However, Plaintiff has presented no evidence of such a discriminatory intent.

Section 504 process requires a school district to design a plan whose overall effect meets Defendant's FAPE obligations under those statutes.  *See id.*

Accordingly, given the unique factual setting of this case, Plaintiffs' Motion must be denied.  As the parties have agreed that this ruling resolves the entire case, the Court construes Defendant's Responses as a cross motion for summary judgment and grants Defendant's construed motion in its favor.

### IV.  CONCLUSION

In accordance with the foregoing, the Court hereby ORDERS as follows:

1. Plaintiff's Motion for Summary Judgment (ECF No. 15) is DENIED on all claims; and

2. The Clerk shall enter judgment for Defendant.  Given the closeness of the questions presented in this case, the Court finds the interests of justice are best served by ordering that all parties bear their own attorney's fees and costs.

Dated this 25th day of February, 2013.

BY THE COURT:

_____
William J. Martínez
United States District Judge

16